IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

STATE V. MORALES-LOPEZ

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

OSVALDO MORALES-LOPEZ, APPELLANT.

Filed August 18, 2020.    No. A-20-259.

Appeal from the District Court for Douglas County: GARY B. RANDALL, Judge. Affirmed.

Renee L. Mathias, of Schaefer Shapiro, L.L.P., for appellant.

Douglas J. Peterson, Attorney General, and Siobhan E. Duffy for appellee.

PIRTLE, BISHOP, and ARTERBURN, Judges.

BISHOP, Judge.

## I. INTRODUCTION

Osvaldo Morales-Lopez, 16 years old at the time of his criminal offense, appeals from an order of the Douglas County District Court denying his request to transfer his case to the separate juvenile court for Douglas County. Finding no abuse of discretion by the district court, we affirm.

## II. BACKGROUND

### 1. INCIDENT LEADING TO CRIMINAL CHARGE

According to an information filed in the district court on September 25, 2019, Morales-Lopez discharged a firearm at a person, dwelling, building, structure, or occupied vehicle while in or in proximity of any motor vehicle on August 24 in violation of Neb. Rev. Stat. § 28-1212.04 (Reissue 2016), a Class IC felony.

- 1 -

On September 30, 2019, Morales-Lopez filed a motion to transfer his case to the separate juvenile court for Douglas County.

2. HEARING ON MOTION TO TRANSFER

A hearing on took place on January 22, 2020. The State offered exhibits 1 through 3, and Morales-Lopez offered exhibit 4. All exhibits were received without objection and the parties agreed to submit their arguments in the form of a proposed order.

(a) State's Evidence

The State suggested to the district court that it review exhibit 2 before exhibit 1, so we will summarize the exhibits in that order here.

(i) Exhibit 2--August 24, 2019

Exhibit 2 contains police reports related to an incident that took place on August 24, 2019. At approximately 6:20 p.m., police officers were dispatched to an address on South 17th Street in Omaha, Nebraska, regarding shots fired in the area. Upon arrival, officers made contact with a man who stated that his vehicle had been struck by gunfire; the man stated he had been inside his home when he heard shots coming from directly in front of his house, which is near the intersection of South 17th and Castelar Streets. The man told officers that when the shooting stopped, he left his home and saw a black Chrysler 300 turn westbound on Castelar Street. The man reported hearing another vehicle turn westbound from South 17th Street, and it would have been in front of the black Chrysler, but he could not see what the vehicle looked like. Approximately 2 minutes later, the man observed the same Chrysler travel eastbound on Castelar Street and then turn south on South 17th Street; he described it as a "'car full'" of teenage females. Officers contacted other witnesses in the area who reported hearing gunshots. One witness heard approximately 10 gunshots and saw "an older gray 4-door sedan, described by her as a Mazda/Honda," and she said "it was occupied by four Hispanic males." She and another witness said a second vehicle, an "older gold 4-door Chevrolet SUV," followed the first vehicle. When officers canvassed the area, they located a "9mm casing" at the intersection of South 17th and Castelar Streets, and a ".22" casing just west of the intersection. Video surveillance from two nearby residences captured just before the shooting showed a silver Honda Accord followed by a black Chrysler 300; after both vehicles passed from one camera's view, the surveillance microphone picked up 10 gunshots.

Also at approximately 6:20 p.m. on August 24, 2019, different officers responded to "UNMC" after dispatch "advised a female victim was dropped off by a male, and stated she was shot near S 16th and Castelar." According to medical staff, the victim exited the vehicle from the rear seat and walked into the emergency room lobby before collapsing; she had sustained two gunshot wounds to her head, one near her left temple, and one to her forehead above her left eye. The female victim was later identified as the girlfriend of a Playboy Surenos Gang member.

The victim was transported to the hospital in a silver 2006 Honda Accord, which was located parked in the emergency entrance drive; "[i]t had a bullet strike through the rear windshield" and "[l]ive .22 caliber rounds could be seen in plain view in the rear seats." The driver of the vehicle, David Gonzalez-Amaya, was detained by off-duty officers.

Gonzalez-Amaya voluntarily went to the police station and was interviewed. When interviewed, Gonzalez-Amaya stated that the black Chrysler was not involved, and that the suspect vehicle was a brown or gold Trailblazer. According to Gonzalez-Amaya, there was a verbal exchange between occupants of his vehicle and the Trailblazer before gunshots were fired. Gonzalez-Amaya assumed there were at least three people in the Trailblazer because he saw someone sitting in the back seat. During his interview, Gonzalez-Amaya identified the occupants of his vehicle: "Danger" was sitting in the front passenger seat, and "Smiley" and the victim were sitting in the back passenger seat during the shooting. According to Gonzalez-Amaya, "Danger" shot an assault rifle at the Trailblazer and "Smiley" was holding a black handgun; Gonzalez-Amaya said he "overheard what he assumed to be 'Smiley' shooting the handgun from the back seat and then saying [the victim] had been shot." After the victim was shot, Gonzalez-Amaya sped off and "Danger" and "Smiley" exited the vehicle near a park before Gonzalez-Amaya took the victim to the hospital. Gonzalez-Amaya was shown photographs of two persons known by an officer to be "Danger" and "Smiley." Gonzalez-Amaya identified J.G. as "Danger," and Morales-Lopez as "Smiley." After officers finished interviewing Gonzalez-Amaya, two "locates" were issued for J.G. and Morales-Lopez.

According to the police reports, the Playboy Surenos Gang is feuding with the 6500 Gang. An active member of the 6500 Gang lives at a residence on South 17th Street, and the house had been shot at on numerous occasions; an "FO" from July 2019 showed that the 6500 Gang member had been in or near a silver 2007 Chevy Trailblazer with two other males, including Vincent Cruz. On August 29, officers located that silver Trailblazer and noted the windshield "appeared to have a bullet defect on the driver side." Later, Cruz, the registered owner of the Trailblazer, stated that on August 24 he was dropping off some of his friends at a residence near Castelar Street. As Cruz and his brother left the residence, they were near 17th and Castelar Streets when a male in the back seat of a silver Honda pointed a black handgun towards them and started shooting; Cruz "retrieved his 9 mm handgun" and fired back.

*(ii) Exhibit 1--August 27, 2019*

Exhibit 1 contains police reports related to events that took place on August 27, 2019. At approximately 12:50 a.m., police officers observed a vehicle in the parking lot of a park located on Harrison Street. Officers made contact with the vehicle, and informed the three occupants that they were violating park curfew and that identification was needed. Morales-Lopez, the driver, provided his name and date of birth; J.G. was identified as the front seat passenger, and a female was identified as the backseat passenger. Officers conducted a data check and learned that Morales-Lopez and J.G. both had "active locates for a felony assault/shooting." After they were removed from the vehicle, a black and green handgun (later identified as a "Smith & Wesson Walther P22," with a clip loaded with 9 bullets; reported stolen) was observed sitting on or near the front passenger seat, and the muzzle of another firearm (later identified as a "Masterpiece Arms 9mm" with a "loaded clip and one in the chamber") was observed underneath the driver's seat. A search of Morales-Lopez' person revealed a "live .40 S&W round in his front right coin pocket" and a "small zip lock bag of methamphetamine" in his sock. During a subsequent search of the vehicle, a black cell phone with a Playboy rabbit and skull on the back of the case was found lying

on the driver's seat, a "folding pocket knife" was found underneath the driver's seat cover, and "an aluminum baseball bat, which had the barrel wrapped in a towel, was located in the trunk."

All three occupants were taken to central headquarters for questioning. Morales-Lopez invoked his rights and was not interviewed. J.G. requested a lawyer and his interview was terminated. During the female passenger's interview, the officer mentioned that the police suspected Morales-Lopez and J.G. had been involved in a recent shooting incident. When asked if she had any involvement in the shooting, she said that her friend was the victim in the shooting. The female passenger eventually told the officer that J.G. told her that he did not know who shot the victim, but that he saw her bleeding from the head. J.G. also told her that after being shot at, he shot back. The officer asked the female passenger who J.G. and Morales-Lopez "were beefing with" and she said they "were beefing with a gang called '65,'" known to the officer as "6500." When the officer mentioned to the female passenger that the jacket she was wearing was Playboy Surenos' attire, she told the officer it was Morales-Lopez' jacket.

Morales-Lopez was transported to the Douglas County Youth Center (DCYC) and booked for unlawfully possessing and transporting a firearm, carrying a concealed weapon (firearm), possession of a handgun by a person under 18 years of age, possession of methamphetamine, violating park curfew, and discharging a firearm near a vehicle or building. J.G. was also transported to the DCYC and booked on several law violations. The female passenger was cited for violating park curfew.

### (iii) Exhibit 3--Juvenile Case Related to July 2019 Incidents

Exhibit 3 is a separately docketed juvenile court case wherein on September 26, 2019, Morales-Lopez was alleged to be within the meaning of Neb. Rev. Stat. § 43-247 (Reissue 2016) for several incidences alleged to have occurred on July 18: count I, manufacturing, distributing, or possessing with intent to distribute methamphetamine, a Class II felony; count II, possession of marijuana, 1 ounce or less, an infraction; count III, possession of drug paraphernalia, an infraction; count IV, leaving the scene of a property damage accident, a Class II misdemeanor; count V, no operator license, a Class III misdemeanor; and count VI, colliding with a fixed object, a violation of a city ordinance.

### (b) Defense's Evidence

Morales-Lopez offered exhibit 4, a psychological evaluation of Morales-Lopez conducted on January 8, 2020, by Dr. Bridget A. Larson, a licensed clinical psychologist. The report states that Morales-Lopez is a "17-year-old-boy" who has been charged with "Discharge into an Occupied Dwelling in Adult Court and Possession of Methamphetamine in Juvenile Court." And it was requested that he complete an evaluation to assist with his motion to transfer to juvenile court.

According to the evaluation, Morales-Lopez was raised by his parents, has one older brother, and two younger sisters. His father was "unexpectedly deported" 1 year prior, and the family's finances became strained following the deportation. At age 15, Morales-Lopez began working 20 hours per week at a commercial laundry company to help offset the financial burden that occurred after his father's deportation. Morales-Lopez was able to have regular phone contact with his father after the deportation, until Morales-Lopez was detained at the DCYC. He was

beginning his junior year of high school prior to his arrest and was currently attending classes at the DCYC. He was thinking about going to college or getting a construction job or joining his brother in the painting business; having a job was important to him so that he could support his family. He was worried that his current legal circumstances could negatively affect his school and career goals, especially if he remained in adult court.

During his evaluation, Morales-Lopez denied any illegal behavior when he was younger. He said that around the age of 16, he did possess drugs on one occasion, possessed his friend's gun for about a day, and once drove a car while intoxicated. The report stated, "Both he and his family denied he is an active gang member and per information from his attorney, [Morales-Lopez] has not been documented by law enforcement as a gang member, though he does appear to spend time with documented gang members."

When discussing the incident that led to charges, Morales-Lopez believed the current charges were very serious and he discussed the negative effect the charges already had on his life, e.g. separating him from his family, and causing his mother to feel stressed, sad, and worried. He "mostly blamed others for his current circumstances," "denied being involved in any planning of the crime or being the leader," and "denied wanting to be any part of this offense and regrets being involved." Morales-Lopez "was able to discuss the consequences of the situation for the victim, and although she was shot twice and required surgery he said, 'But there was really no lasting effect.'" "He also reported the situation was dangerous for the community in general because 'someone else could've gotten hurt.'" To keep himself out of trouble in the future, he said he will stay at home with his family and choose the right friends.

Larson opined "that it is in the best interests of [Morales-Lopez] to be adjudicated in Juvenile Court and connected with community and school resources." She recommended individual and family therapy to assist in working through the stress associated with the current legal charges and the stress related to the family's separation due to the father's deportation. She also recommended that Morales-Lopez become more actively involved in clubs and associations at school to assist him in developing a strong peer support group, as well as partnering with a mentor. Larson stated, "While allowing [Morales-Lopez] to be in the least restrictive environment, such as at home with his family attending classes at [his high school] would be desirable," "a program such as Boys Town Residential Treatment Center, may be most beneficial to [him] at this time, if he and his family are willing to commit to this type of assistance." Larson noted that this was Morales-Lopez' first interaction with the legal system and the first time he has been charged with any type of an offense, and that "he has never had the opportunity to avail himself of services of Juvenile Court." She stated:

> It seems best for his future success to return to Juvenile Court to have the opportunities available uniquely to teenagers involved in the juvenile system. He is after all a teenager, and at the age of 17, does not have the fully developed brain he will have in adulthood to assist more completely with executing functioning, reasoning and impulse control. While he is mature and responsible in some areas of his life, his cognitive immaturity is also evident in looking at his school records and in various statements made during the interview, such as his belief that despite the victim getting shot in the head twice, she will have no long-term consequences, such as possible brain damage or cognitive limitations. He seemed completely unaware that this was a potential consequence of brain trauma, and

highlights the belief of "invincibility" that most teenagers adopt wherein they believe they are invincible to death or serious injury.

Given his presentation of being extremely compliant with me and putting forth full effort during this evaluation he has, in my opinion, a good prognosis if given the opportunity to take advantage of services available to teenagers through Juvenile Court.

### 3. DISTRICT COURT'S ORDER

The district court entered an order on March 16, 2020, denying the motion to transfer. The court pointed out that Morales-Lopez was 1 month shy of his 17th birthday at the time of the offense. It noted that Morales-Lopez' only prior contact with the juvenile court system related to a charge of possession with intent to deliver methamphetamine and other related minor charges stemming from an incident on July 18, 2019. That charge was not adjudicated as a result of the present case, and therefore the district court acknowledged that Morales-Lopez had "not been given any juvenile court services based on [the prior juvenile court] filing, nor has he had any previous [adjudications] in juvenile court."

Nevertheless, when considering the transfer factors set forth in Neb. Rev. Stat. § 43-276 (Supp. 2019), the district court found that transferring Morales-Lopez to juvenile court was not appropriate when "considering the current age of [Morales-Lopez] along with the extremely serious, violent act alleged[.]" The details of the district court's consideration of the factors contained in § 43-276 will be provided in our analysis below.

## III. ASSIGNMENT OF ERROR

Morales-Lopez claims the district court abused its discretion by determining the State had met is burden to prove a sound basis existed to retain the case in district court and thus denying his motion to transfer to juvenile court.

## IV. STANDARD OF REVIEW

A trial court's denial of a motion to transfer a pending criminal proceeding to the juvenile court is reviewed for an abuse of discretion. *State v. Hunt*, 299 Neb. 573, 909 N.W.2d 363 (2018). An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *Id.*

## V. ANALYSIS

### 1. JURISDICTION

When a juvenile seeks to transfer a criminal case from adult court to juvenile court, Neb. Rev. Stat. § 29-1816(3)(c) (Cum. Supp. 2018) provides that "[a]n order granting or denying transfer of the case from county or district court to juvenile court shall be considered a final order for the purposes of appeal." The statute further states that, upon entry of such an order, "any party may appeal to the Court of Appeals within ten days." On March 16, 2020, the district court entered an order denying Morales-Lopez' motion to transfer his case to juvenile court, and Morales-Lopez filed his notice of appeal March 26; his appeal is timely.

## 2. LEGAL FRAMEWORK

Neb. Rev. Stat. § 43-246.01(3) (Reissue 2016) grants concurrent jurisdiction to the juvenile court and the county or district courts over juvenile offenders who (1) are 11 years of age or older and commit a traffic offense that is not a felony or (2) are 14 years of age or older and commit a Class I, IA, IB, IC, ID, II, or IIA felony. Actions against these juveniles may be initiated either in juvenile court or in the county or district court. In the present case, the allegations against Morales-Lopez put him within this category of juvenile offenders, and the State filed the charge against Morales-Lopez in the district court.

When an alleged offense is one over which both the juvenile court and the criminal court can exercise jurisdiction, a party can move to transfer the matter. For matters initiated in criminal court, a party can move to transfer it to juvenile court pursuant to § 29-1816(3). In the instant case, when Morales-Lopez moved to transfer his case to juvenile court, the district court conducted a hearing pursuant to § 29-1816(3)(a), which subsection requires consideration of the following factors set forth in § 43-276(1):

> (a) The type of treatment such juvenile would most likely be amenable to; (b) whether there is evidence that the alleged offense included violence; (c) the motivation for the commission of the offense; (d) the age of the juvenile and the ages and circumstances of any others involved in the offense; (e) the previous history of the juvenile, including whether he or she had been convicted of any previous offenses or adjudicated in juvenile court; (f) the best interests of the juvenile; (g) consideration of public safety; (h) consideration of the juvenile's ability to appreciate the nature and seriousness of his or her conduct; (i) whether the best interests of the juvenile and the security of the public may require that the juvenile continue in secure detention or under supervision for a period extending beyond his or her minority and, if so, the available alternatives best suited to this purpose; (j) whether the victim agrees to participate in restorative justice; (k) whether there is a juvenile pretrial diversion program established pursuant to sections 43-260.02 to 43-260.07; (l) whether the juvenile has been convicted of or has acknowledged unauthorized use or possession of a firearm; (m) whether a juvenile court order has been issued for the juvenile pursuant to section 43-2,106.03; (n) whether the juvenile is a criminal street gang member; and (o) such other matters as the parties deem relevant to aid in the decision.

The customary rules of evidence shall not be followed at such hearing and, "[a]fter considering all the evidence and reasons presented by both parties, the case shall be transferred to juvenile court unless a sound basis exists for retaining the case in county court or district court[.]" See § 29-1816(3)(a).

As the Nebraska Supreme Court has explained, in conducting a hearing on a motion to transfer a pending criminal case to juvenile court, the court should employ "a balancing test by which public protection and societal security are weighed against the practical and nonproblematical rehabilitation of the juvenile." *State v. Stevens*, 290 Neb. 460, 465, 860 N.W.2d 717, 725 (2015). "In order to retain the proceedings, the court need not resolve every factor against the juvenile, and there are no weighted factors and no prescribed method by which more or less

weight is assigned to a specific factor." *Id.* "The burden of proving a sound basis for retention lies with the State." *Id.*

### 3. WAS DENIAL OF TRANSFER ABUSE OF DISCRETION?

Morales-Lopez contends the district court based its decision on his age and the violent nature of the alleged offense. He notes that the court conceded that Morales-Lopez had not been given any juvenile services, yet the court "did not make any specific finding or rely upon any specific evidence that the services recommended by Dr. Larson would not be successful in rehabilitating [Morales-Lopez] while he is still a minor." Brief for appellant at 10. He argues that "[t]here was no evidence provided to contradict Dr. Larson's recommendation or opinion that she believed [Morales-Lopez] would be successful in Juvenile Court." *Id*. He points to evidence that he was "on top of his studies," "was working twenty-hours per week to help provide necessary food and stability to his family," and that this "clearly demonstrates that [he] would be [amenable] to the structure afforded by Juvenile Court." *Id*. Further, Morales-Lopez argues that his psychological testing establishes that he would be a low risk for dangerousness and violence, and he has "never had an opportunity to avail himself to the services available in Juvenile Court," and "would benefit from individual and family therapy that he could receive" there. *Id*. at 13.

The State contends the evidence supports the district court's decision, noting that the crime at issue was "extremely violent," that "Morales-Lopez fired a gun out of a vehicle at another car, possibly striking a passenger in his own car," and that there was evidence "this may have been gang related." Brief for appellee at 11. Further, "at the time the order was entered the juvenile court would have had only 18 months before it lost jurisdiction," and a "longer probation or prison sentence in adult court could provide Morales-Lopez with services to ensure he does not repeat his offenses for a longer period." *Id*.

### (a) Factors Favoring Retention

The district court found the following factors favored retention in the district court: § 43-276(1)(b), "The crime charged is extremely violent. The alleged victim suffered a gunshot wound to the head. [Morales-Lopez] and his co-defendant are alleged to have fired shots at a rival gang. The victim was in the vehicle with the defendant"; § 43-276(1)(c), "motivation in the instant case is simply violence directed at a rival gang member"; § 43-276(1)(d), Morales-Lopez "is currently 17" and will turn 19 in September 2021, "which leaves only 18 months for the juvenile court to have jurisdiction over him," and his codefendant was of similar age; § 43-276(1)(g), when considering public safety, the district court pointed out that "[t]his was an extremely violent offense and that "[c]onsideration of public safety demands retaining the case in adult court. Whether [Morales-Lopez] is ultimately given prison or jail time, both results would keep the public safer for a longer period of time"; § 43-276(1)(h), when considering Morales-Lopez' ability to appreciate the nature and seriousness of his conduct, the district court referred to Dr. Larson's report which indicated, among other things, there was no evidence of bizarre or psychotic processes and that Morales-Lopez was aware of the wrongfulness of criminal behavior; § 43-276(1)(i), when considering whether the best interests of the juvenile and the security of the public may require that the juvenile continue in secure detention or under supervision for a period extending beyond his or her minority and the best alternatives suited to this purpose, the district

court noted that "while a transfer to juvenile court may be in the best interest of [Morales-Lopez], it is not in his best interests if the concerns cannot be addressed in the 18 months' time remaining [and a] longer probation or prison sentence in adult court could provide him with services to ensure he does not repeat his offenses for a longer period"; § 43-276(1)(k), noting there was no evidence regarding a juvenile pretrial diversion program, the district court nevertheless pointed out that "given the serious nature of the offense, this would not likely be a divertible offense"; § 43-276(1)(n), the district court referred to police reports indicating this was a gang-related offense.

### (b) Factors Favoring Transfer

Under § 43-276(1)(a), the district court found that Morales-Lopez "would be amenable to treatment in juvenile court but also . . . there are treatment options in adult court while on probation or in the event [Morales-Lopez] is incarcerated"; § 43-276(1)(e), in considering Morales-Lopez' history, including whether he had been convicted of any previous offenses or adjudicated in juvenile court, the district court found this factor favored transfer to juvenile court; § 43-276(1)(f), regarding the best interests of the juvenile, the district court stated, "Certainly avoiding a criminal conviction in [an] adult case is in the juvenile's best interests and arguably weighs in favor of transfer; § 43-276(1)(l), the district court found no evidence that Morales-Lopez had previously possessed a firearm; § 43-276(1)(m), the district court found no evidence that a juvenile court order had been issued pursuant to Neb. Rev. Stat. § 43-2,106.03 (Reissue 2016) (related to juvenile court disposition and prior finding that juvenile is not amenable to rehabilitative services provided under Nebraska Juvenile Code).

### (c) Neutral Factor

Under § 43-276(1)(j), the district court noted that there was no evidence related to whether or not the victim and Morales-Lopez agreed to participate in restorative justice.

### (d) No Abuse of Discretion

By our count, the district court found eight factors favored retention of the case in the district court and five factors favored transfer to the juvenile court. However, there is no arithmetical computation or formula required in a court's consideration of the statutory criteria or factors. *State v. Esai P.*, 28 Neb. App. 226, 942 N.W.2d 416 (2020). There are no weighted factors, that is, no prescribed method by which more or less weight is assigned to each factor specified by statute. *Id*. It is a balancing test by which public protection and societal security are weighed against the practical and nonproblematical rehabilitation of the juvenile. *Id*. "This means that a trial court must balance a juvenile's amenability to complete rehabilitation by age 19 against the public's safety in the event that rehabilitation fails or requires more time than anticipated." *State v. Leroux*, 26 Neb. App. 76, 118, 916 N.W.2d 903, 929 (2018). "The trial court's decision carries the consequences that if the decision is wrongly made, we have either missed an opportunity to rehabilitate a juvenile outside the negative influences of adult incarceration or failed to adequately incarcerate a potentially dangerous juvenile who will go on to commit further violent crimes." *Id*.

As we often state in our review of juvenile transfer cases, these are difficult decisions for the trial court and for this court on appeal because of the young age of the defendants. However, a

young age by itself does not support a transfer to the juvenile court. See *State v. Esai P., supra* (setting forth cases of defendants as young as 14 or 15 years of age in which criminal proceedings were retained in district court because factors favoring public protection outweighed juvenile's young age, such as involvement with gangs and guns, violent nature of crime, or unlikely success of rehabilitation before juvenile reaches age of majority).

In this case, the district court was properly concerned about the extremely violent nature of the incident which resulted in an 18-year-old victim being shot in the head. Morales-Lopez, holding a black handgun, was alleged to be in the backseat of the Honda Accord with the victim, when there was some type of verbal exchange between the occupants of the Honda Accord and the occupants of a Trailblazer. Shots were then fired. There was a bullet strike through the rear windshield of the Honda Accord and there were live .22 caliber rounds in the rear seats. A front seat passenger in the Honda Accord, J.G., shot an assault rifle at the Trailblazer. The driver of the Honda Accord heard what he assumed to be Morales-Lopez shooting the handgun from the back seat and then saying that the victim had been shot. Cruz, the registered owner of a Trailblazer that had a windshield with a bullet defect on the driver's side, reported that on August 24, 2019, when he was dropping off some friends at a residence near Castelar Street, a male in the back seat of a silver Honda pointed a black handgun towards them and started shooting. Cruz retrieved his 9 mm handgun and fired back.

The district court was understandably concerned about the violent nature of the August 24, 2019, incident, and its apparent gang-related motivation. In addition, although it is true that Morales-Lopez had not yet received services through the juvenile court, he was already in the juvenile system for July incidences related to methamphetamine, marijuana, property damage, leaving the scene, and no operator's license. Despite knowing he was facing consequences related to those actions, just a month later, Morales-Lopez was involved in an exchange of gunfire with individuals associated with a feuding gang. And then just 3 days after the shooting incident, Morales-Lopez, J.G., and a female passenger were in a vehicle in a parking lot at a park at 12:50 a.m., which was after park curfew. Morales-Lopez was the driver. After discovering Morales-Lopez and J.G. had "active locates for a felony assault/shooting," police officers found in the vehicle a black and green "Smith & Wesson Walther P22" handgun (reported stolen) and a clip loaded with 9 bullets. They also found a "Masterpiece Arms 9mm" with a loaded clip and "one in the chamber" underneath the driver's seat with the muzzle showing. On Morales-Lopez' person was a "live 40 S&W round in his front right coin pocket" and a "small zip lock bag of methamphetamine" in his sock. Also, lying on the driver's seat of the vehicle was a black cell phone with a Playboy rabbit and skull on the back of the case. There was a "folding pocket knife" underneath the driver's seat cover, and there was "an aluminum baseball bat, which had the barrel wrapped in a towel," located in the trunk. When taken to central headquarters for questioning, Morales-Lopez invoked his rights and was not interviewed. The female passenger was wearing a Playboy Surenos jacket, but indicated the jacket belonged to Morales-Lopez.

Based on the behaviors exhibited by Morales-Lopez despite knowing he was already facing consequences in the juvenile court as a result of his actions in July 2019, it is evident his view of any juvenile court consequences had no impact in changing his behavior when the very next month he was involved in the violent shooting incident on August 24. And even that dangerous incident appeared to have minimal impact given his belief that "there was really no lasting effect" on the

shooting victim, who was shot twice and required surgery. Further, when Morales-Lopez was apprehended on August 27, he was the driver of a vehicle containing two firearms, loaded clips, a pocket knife, and a towel-wrapped baseball bat; additionally, he had methamphetamine in his sock. There was ample evidence presented to support the district court's concerns that the limited time remaining under the juvenile court's jurisdiction would be insufficient to ensure the safety of the public while attempting to rehabilitate Morales-Lopez.

When a district court's basis for retaining jurisdiction over a juvenile is supported by appropriate evidence, it cannot be said the court abused its discretion in refusing to transfer the case to juvenile court. *State v. Leroux, supra*. Given the evidence in this case, we cannot say the district court abused its discretion in refusing to transfer the case to juvenile court.

## VI. CONCLUSION

Finding no abuse of discretion by the district court in its decision to retain jurisdiction over Morales-Lopez, we affirm the March 16, 2020, order denying Morales-Lopez' motion to transfer the proceedings to juvenile court.

AFFIRMED.